UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | : | |
|---|---|---|
| In re: | : | |
| | : | |
| LEGACY GLOBAL SPORTS, L.P., | : | CHAPTER 7 |
| | : | CASE NO. 20-11157-JEB |
| Alleged Debtor. | : | |
| | : | |
| | : | |

**ALLEGED DEBTOR'S MOTION FOR ABSTENION
PURSUANT TO BANKRUPTCY CODE SECTION 305(a)(1)**

Legacy Global Sports, L.P. (the "LGS"), hereby moves for an order pursuant to 11 U.S.C. § 305(a)(1) temporarily suspending proceedings in this case so as to allow the Alleged Debtor time to complete ongoing negotiations for the sale of some or all of its assets on a going-concern basis. In support of this Motion, the Alleged Debtor respectfully states:

**PRELIMINARY STATEMENT**

1. The Alleged Debtor, which is headquartered in Boston and has more than 400 employees nationwide and more than 130 employees in Massachusetts, hosts and manages youth sports event tours, tournaments, camps and clubs, both locally and nationally. The COVID-19 global pandemic and resulting prohibitions on people gathering in large groups has forced the Alleged Debtor to cancel or postpone nearly all of its live events, bringing ongoing business operations to a standstill, temporarily devastating its revenue stream and causing a severe liquidity crisis. Tremendous uncertainty remains concerning when, and to what extent, the Alleged Debtor can return to something akin to normal operations. Prior to the involuntary petition commencing this case, the Alleged Debtor and those of its subsidiaries with ongoing operations have survived through periodic secured loans from its owner/secured debtholder Jefferson River Capital ("JRC") sufficient to maintain basic infrastructure and operations.

2. In light of these circumstances, it has become clear that the only way to realize any going-concern value from the Alleged Debtor's businesses would be to sell them. The Alleged Debtor engaged Stout Risius Ross Advisors, LLC ("SRR") as its investment banker with a mandate to pursue the sale of some or all of its business as a going concern. The Alleged Debtor is currently negotiating with two parties over the purchase of portions of its business. (The targeted business segments overlap such that the potential offers compete with each other). These buyers have structured the potential transaction to include assumption of all liabilities arising directly from the businesses to be purchased. Assumed liabilities would include deposits by customers for events that were cancelled (they would receive credit toward future events) and accounts payable to vendors. These liabilities represent about $4.5 million for the hockey/tours business, and about $750,000 for the lacrosse business. (Subsidiaries of the Debtor operate a soccer business, but at present there are no active discussions with potential offerors for that business.) In addition to being relieved of the liabilities any buyer would wish to assume so as to preserve going-concern value, the Alleged Debtor would receive other economic benefits including cash payable at closing and/or advanced as debtor-in-possession financing.

3. Notwithstanding these active negotiations, a firm deal has not been executed. Especially under current circumstances, the process requires additional time. The petitioning creditors are understandably frustrated that the Alleged Debtor has not yet honored or contracted with a buyer to honor the obligations due them, which arise from the hockey/tours business. But immediate payment/assumption is not an available option, and at this time the Alleged Debtor lacks the resources to consider converting to a chapter 11 case.

4. Against this backdrop, entering an order for relief under chapter 7 is not the value-optimizing outcome. An order for relief under chapter 7 would shut down the Debtor's

businesses and destroy going-concern value. Even if the trustee wished to exercise the unusual option to operate for a limited time, he or she would be unable to do so because no cash is available and cash flow is negative. The only hope for a meaningful distribution to creditors from the Debtor's businesses is to provide more time for the Alleged Debtor and SRR to negotiate one or more transactions.

5. For these reasons, the Alleged Debtor is requesting through this motion that, as expressly authorized by Section 305 of the Bankruptcy Code, this Court suspend proceedings on the involuntary petition for a period of 45 days. The Alleged Debtor proposes to keep the petitioning creditors and the Court informed of progress toward a transaction. In the meantime, creditors lose nothing. Whatever causes of action creditors have, or the estate would have upon entry of an order for relief, will be intact if an order for relief is eventually entered, whether under chapter 7 or 11. In the meantime, the Alleged Debtor's businesses would avoid the irreparable harm that would result from an order for relief under chapter 7.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is Section 305(a)(1) of the Bankruptcy Code.

## BACKGROUND

**A.    The Alleged Debtor's Business**

7. The Alleged Debtor is the parent company of a corporate group (the "LGS Group") of 29 entities, headquartered in Boston, that employ approximately 400 people nationwide and more than 130 within the Commonwealth of Massachusetts. Prior to the onset of

the COVID-19 pandemic, the LGS Group operated one of the premier youth sports events and management businesses in the country, that involved hosting and managing youth sport event tours, tournaments, camps and clubs. In connection with those events, the LGS Group also provided transportation and housing services to their participants across the globe.

8. On an annual basis the LGS Group provided over 200,000 elite youth athletes and their families with access to iconic, aspirational experiences through elite tournaments, exclusive club memberships (including year-round training programs, practice schedules and customized apparel) and international tours. The LGS Group has operated some of the world's top-tier youth sports programs and events, including Global Premier Soccer (GPS), Selects Hockey, T3 Lacrosse, World Selects International, National Lacrosse Classic and Motown Classic, and in 2019 generated approximately $55.9 million in revenue.

9. The LGS Group's operations are divided into three main business segments: ice hockey, lacrosse and soccer. The Alleged Debtor primarily owns the assets associated with the ice hockey and lacrosse businesses, while also providing general corporate and support services to the entire corporate group, including the soccer business, which is owned by various subsidiaries.

   a. **Ice Hockey**

10. The Alleged Debtor annually hosts over 40 events for approximately 2,000 youth teams across various age groups, including well known team tournaments such as the Motown Classic, Nations Cup, Kennedy Tournament, Fire on Ice and World Selects Invitational. The Alleged Debtor's ice hockey division is best known for the "Selects" brand, which caters to the most elite youth hockey players. Selects teams are compiled with the best hockey players (boys and girls), and teams participate in tournaments, camps, and developments programs with the

goal of playing collegiate and/or professional ice hockey.  LGS subsidiaries own equity interests in non-debtors Swedsports Tournament & Event, AB and LGS Europe, AB, which offer a wide array of tournaments, camps, teams, and international tours for teams of all ages and abilities.

      **b.  Lacrosse**

11.    The Alleged Debtor acquired the "T3 Lacrosse" brand in 2018, which provides lacrosse tournaments, showcases, club teams, and international tours for girls' lacrosse players aspiring to compete at the collegiate level.  With more than 25 lacrosse events year-round, the Alleged Debtor is a leader in the youth lacrosse business.  The most notable tournament is the National Lacrosse Classic (since renamed the National Lacrosse Academy).

      **c.  Soccer**

12.    In 2016, the Alleged Debtor acquired 80% of Global Premier Soccer ("GPS") and its wholly-owned subsidiaries.  GPS provides development and coaching to youth soccer players to prepare them to compete at an elite level.  GPS is one of the largest and most recognized club soccer programs with teams across North America and partnership in Europe.

    **B.    Secured Debt**

13.    On July 2, 2015, the Alleged Debtor became a borrower under a revolving credit facility with The Provident Bank ("Provident"), and on October 31, 2016 became a borrower under a term loan facility also with Provident.  The Alleged Debtor and Provident executed a certain Amended and Restated Credit Agreement dated August 10, 2018 (the "Provident Credit Agreement"), which Provident subsequently assigned to JRC and Generation Capital LGS, LP ("GenCap"), pursuant to that certain Assignment and Assumption Agreement dated June 7, 2019, between JRC, GenCap, Provident and Cortland Capital Market Services LLC ("Cortland"), as Collateral Agent.  JRC and GenCap agreed to exchange their rights under the

Provident Credit Agreement, including the aggregate principal amounts owed thereunder, for senior secured convertible promissory notes issued by the Alleged Debtor pursuant to the Second Amended and Restated Note Purchase and Exchange Agreement (the "Original Note Purchase Agreement") in an aggregate principal amount of $5,674,183. The obligations under the Original Note Purchase Agreement are secured by a first priority lien on and security interest in substantially all of the Alleged Debtor's assets.

14. JRC and GenCap subsequently provided $2,000,000 in additional funding on or about January 21, 2020 to finance operations in exchange for the Alleged Debtor issuing additional senior secured convertible promissory notes. JRC alone provided additional funding in exchange for senior secured promissory notes from either the Alleged Debtor or the Alleged Debtor and certain affiliates as follows: (i) $612,244.90 on or about March 25, 2020; (ii) $1,122,448.98; on or about April 9, 2020; (iii) $306,122.45 on or about April 23, 2020; (iv) $306,122 on or about May 7, 2020; (v) $714,286 on or about May 15, 2020; (vi) $255,102 on or about May 22, 2020; (vii) $719,390 on or about May 27, 2020; and (viii) $306,122 on or about June 4, 2020.

    **C.**    **Impact of COVID-19 and Participant Deposit Issue**

15. In normal times, the Alleged Debtor's main source of revenue is the registration fees paid by participants to attend their more than 450 events hosted worldwide. Generally, participants must pay a deposit, sometimes months in advance, to reserve their spot at one of the Alleged Debtor's events or on one of its teams. The Alleged Debtor then uses those participant deposits to pay the various costs associated with putting on the event, including user fees to third party venues where the events are hosted and other vendors that are necessary to conduct the event. However, until an event is actually held and the fees associated with that event are fully

earned, the Alleged Debtor carries a deferred revenue liability associated with the customer deposits. The Alleged Debtor currently has approximately $5.6 million in unsecured participant deposits ("Participant Deposits"), in addition to $6.9 million in other unsecured claims.

16. The COVID-19 global pandemic and resulting governmental orders prohibiting individuals from gathering in large groups have forced the Alleged Debtor to cancel or postpone nearly all of its live events, and have created tremendous uncertainty about when regular business may resume. The forced cancellations have caused a catastrophic decline in the Alleged Debtor's revenue stream, forcing it to terminate or furlough employees and creating a severe liquidity crisis. Prior to the COVID-19 outbreak certain former employees engaged in conduct resulting in an ongoing criminal investigation by the Department of Justice into alleged illegal visa activities that has contributed to the vulnerability of the Alleged Debtor's business.

17. Much of the Alleged Debtor's enterprise value is locked up in the goodwill it has with its customer base. In the event the Alleged Debtor is forced to shut down and liquidate, customers who have paid Participant Deposits will not receive refunds and there will be no future events to which those deposits may be credited. In fact, the Allege Debtor does not anticipate that funds will be available to pay any meaningful amount to unsecured creditors in a chapter 7 proceeding. The only way to preserve value for unsecured creditors and other parties in interest is through a going concern sale of some or all of the Alleged Debtor's business.

**D. Ongoing Negotiations With Potential Buyers**

18. Given the unprecedented economic challenges facing the Alleged Debtor's business and resulting severe liquidity constraints, the Alleged Debtor's board concluded that the only way to preserve and maximize value for creditors and other parties in interest was to sell the

business as a going concern. To that end, on or about May 13, 2020, the Alleged Debtor hired SRR as its investment banker to market the company and its separate business segments for sale.

20. Almost immediately SRR received interest in the Alleged Debtor's hockey business from one of its competitors in that business segment (the "Hockey Buyer"). Since the initial expression of interest, the parties have engaged in negotiations concerning sale terms which, if consummated, would involve, among other things, the assumption of *all* of the unsecured liabilities and customer deposits associated with the Alleged Debtor's hockey business in addition to a cash payment. However, the Hockey Buyer has stated that two considerations are critical to the deal in order to ensure continuity and maintain customer goodwill: (1) that the Alleged Debtor continue as a going concern until the sale closes; and (2) that the bulk of its purchase consideration be paid in the form of assumption of hockey creditor liabilities, including Participant Deposits, in order to keep the hockey business customers and vendors happy and likely to continue to do business in the future.

20. The Alleged Debtor is also in active negotiation with GenCap, which (as noted above) holds a portion of the Alleged Debtor's secured debt but is not affiliated with the owner of the Alleged Debtor and does not otherwise have any control of the Alleged Debtor. Given GenCap's extensive knowledge of the Alleged Debtor's assets and operations, GenCap is well situated to act quickly in regard to a transaction.

21. Based on negotiations to date, neither buyer has interest in acquiring the Alleged Debtor's assets in the event the business is forced to close and liquidate through a chapter 7 proceeding.

## ARGUMENT

<u>Temporarily Abstaining to the Allow the Alleged Debtor to Complete Ongoing Sale Negotiations is in the Best Interests of the Debtor's Creditors and All Parties in Interest</u>

22. Section 305(a)(1) of the Bankruptcy Code provides that the Court may dismiss or suspend the case under title 11 at any time if "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1). The legislative history to Section 305(a) indicates, by way of example, that a case may be dismissed

> if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in the arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case.

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 325 (1977) S.R. Rep. No. 95-989, 95th Cong.2d Sess. 36 (1978). "A bankruptcy court's decision to abstain under § 305(a) is discretionary and must be made on a case-by-case basis." <u>In re Efron</u>, 529 B.R. 396, 405 (1st Cir. B.A.P. 2015).

23. While no one factor is determinative, courts have considered a wide variety of factors to evaluate whether abstention is appropriate under § 305(a), including: (1) the purpose of the bankruptcy; (2) the necessity of federal proceedings to achieve a just and equitable solution; (3) the availability of another forum to resolve the unsettled issues; (4) the efficiency and economy of having the bankruptcy court settle the matter; (5) the possible prejudice to the various parties; and (6) whether the bankruptcy forum is being used to resolve what is in essence a two-party dispute." <u>Id.</u> at 405-06. "The exact factors to be considered and the weight to be given each of them is highly sensitive to the facts of each individual case." <u>Id.</u>

24. Under the circumstances of this case, especially considering that the Alleged Debtor seeks only a temporary suspension of proceedings in this case, the overriding consideration should be the potential prejudice to creditors and other parties in interest. It is abundantly clear that chapter 7 liquidation will cause irreparable harm to all of the Alleged Debtor's constituents, including not only its creditors as such but also its employees, customers, vendors, partners and other parties in interest. On the other hand, there is no prejudice, and in fact a substantial potential benefit to allowing the Alleged Debtor a period of time to allow its going-concern sale negotiations to play out.

25. Once the Alleged Debtor succeeds (or fails) in obtaining a going-concern offer that the Alleged Debtor proposes to this Court to be in the best interest of creditors to pursue, it will be appropriate to determine the legal path for the Alleged Debtor to follow. One possibility, if funding is available, would be chapter 11. Another possibility is that dismissal would be appropriate to permit the transaction to be consummated – perhaps with safeguards to be negotiated with parties in interest. There is no prejudice to any party in leaving the ultimate path to be determined ata future date in light of then-existing circumstances.

26. In the alternative, if the proposed suspension is not approved, the Alleged Debtor moves that this case be dismissed. Dismissal would better serve the creditors than the complete destruction of value that would result from an order for relief under chapter 7.

WHEREFORE, the Alleged Debtor respectfully requests that the Court: (i) abstain from and suspend proceedings in this case for a period of 45 days, subject to extension for cause shown; (ii) alternatively, dismiss the case; and (iii) grant such other further relief as the Court deems just and proper.

10814199v1

Respectfully submitted,

LEGACY GLOBAL SPORTS, L.P.,

By its attorneys,

/s/ *Jonathan M. Horne*
Daniel C. Cohn, Esq., BBO #090780
Jonathan M. Horne, Esq., BBO #673098
Murtha Cullina LLP
99 High Street
Boston, MA 02110
(617) 457-4000 Telephone
(617) 482-3868 Facsimile
dcohn@murthalaw.com
jhorne@murthalaw.com

Dated:   June 12, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2020, I filed this document through the Court's ECF system, which will send an electronic copy to the registered participants as identified on the Notice of Electronic Filing (NEF)
.

/s/ *Jonathan M. Horne*
Jonathan M. Horne (BBO #673098)

10814199v1