**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>Legacy Global Sports, L.P., *et al.*.<br><br>      Debtors. | Chapter 7<br><br>Case No. 20-11157 (JEB)<br><br>(Jointly Administered) |

**OBJECTION BY JOHN ST. PIERRE TO TRUSTEE'S MOTION FOR ENTRY OF**
**ORDER AUTHORIZING AND APPROVING STIPULATION OF SETTLEMENT**

## I.   INTRODUCTION

John St. Pierre ("St. Pierre") is a creditor of debtor Legal Global Sports, L.P. ("Legacy"

or the "Company") and affiliated debtors in the above-captioned Chapter 7 cases (collectively,

the "Debtors").  St. Pierre hereby objects to the Motion [Dkt. 275] (the "Motion") filed by Harry

B. Murphy, Chapter 7 Trustee (the "Trustee") of the Debtors' estates (the "Estates"), to Approve

the Stipulation of Settlement [Dkt. 274] ("Stipulation") between Jefferson River Investors I, LLC

("JRC") and the Trustee.  The Stipulation is not in the best interests of creditors:

- The Stipulation provides for a general release of JRC, the investment firm that breached its fiduciary duties to the Debtors by engaging in a series of self-serving transactions that resulted in the Debtors' insolvency and eventual liquidation for a fraction of its former value.  JRC undertook a deliberate scheme to acquire the Debtors' assets and equity at a deflated price, and the Trustee's proposed Stipulation plays directly into JRC's playbook by delivering the remnants of the Debtors to JRC.[1]

---

[1] The facts of this case are closely similar to those in *In Re: New England Confectionery Company (NECCO)*, Adversary Proceeding No. 18-01140-MSH.  In *NECCO*, the same Trustee in the instant case challenged claims filed by a secured creditor (ACAS) that was alleged to have used its control over NECCO to engage in pattern of inequitable conduct, to include mischaracterizing equity investments as loans and extracting unsubstantiated fees and interest from NECCO.  The Trustee alleged that ACAS breached its fiduciary duty to NECCO, and that ACAS's claim should equitably subordinated to those of unsecured creditors.

1

- In the two years after JRC gained control of Legacy in April 2018, Legacy was driven from a Company with 2019 revenues exceeding $55 million, into a liquidation that netted proceeds of only $370,000.

- JRC exercised pervasive control over Legacy for its own purposes at the expense of Legacy's creditors.  From and after April 2018, Legacy had no independence from JRC.

- JRC became Legacy's lender at exorbitant (15%) interest rates and upon predatory terms.

- During the two years prior to this bankruptcy filing, while Legacy's Board of Managers ("Board") was under the control of JRC, Legacy's overhead ballooned by $18 million year over year from 2018 to 2019, as the JRC-controlled Board directed the payment of hundreds of thousands, if not millions, of dollars in inflated interest payments and unsubstantiated fees to JRC and its attorneys, advisors, consultants, and agents.

- In the Spring of 2020, when bankruptcy was imminent, and after the COVID-19 pandemic forced the cancellation of youth sporting events that Legacy customers had already paid for, JRC refused to return travel refunds to customers, even though airlines and hotels had repaid the refunds to Legacy.  JRC instead used the refunds to pay its consultants and attorneys, leaving customers unpaid.

- JRC was an investor in and lender to Legacy, and it also controlled Legacy's Board and daily management.  Due to these multiple roles, JRC owed fiduciary duties to Legacy, which it clearly breached.

- JRC made "loans" to Legacy while Legacy was insolvent, and used the loans to repay itself.

- The Stipulation would waive all claims against JRC and release JRC from liability for its prior conduct and role in bankrupting the Debtors.

- The Trustee proposes to accept, at face value, the full amount of JRC's alleged $10,449,106.41 secured claim (the "JRC Claim"), but the JRC Claim should be equitably subordinated or re-characterized as equity given JRC's inequitable conduct and the circumstances surrounding its "loans."

- Approval of the Stipulation would result in JRC receiving substantially all of the value of the Estates, notwithstanding that JRC's inequitable conduct caused substantial damage to Legacy and its creditors for JRC's own purposes.

- Were the Stipulation approved, JRC, which played a central role in Legacy's failure, would avoid any accountability for its prior conduct, and it would be the only entity

likely to derive any recovery from these proceedings. The Trustee has not sufficiently investigated JRC's role in, and responsibility for, the disappearance of Legacy's assets. Instead the Trustee proposes to waive the Estates' claims against JRC and deliver any remaining assets to JRC. However, the Trustee has valuable claims against JRC for the damages that JRC caused to Legacy and its creditors, and those claims greatly exceed the meager net proceeds that the Trustee netted from the auction of the Debtors' assets.

For these reasons, the Trustee's motion to approve the Stipulation should be denied, and the Trustee should (a) seek damages from JRC for breach of fiduciary duty, (b) subordinate JRC's claims against Legacy to the claims of all other creditors, (c) recharacterize any JRC loans to Legacy as equity infusions, and (d) recover the preferential payments and fraudulent transfers that JRC received from Legacy.

## II.    RESPONSE TO MOTION

St. Pierre responds to the Trustee's averments in the Motion as follows:

1.    St. Pierre admits Paragraphs 1-3.

2.    Paragraphs 4-8 include statements from websites which speak for themselves.

3.    St. Pierre admits Paragraphs 9-12.

4.    St. Pierre is without sufficient information to admit or deny Paragraphs 13-22.

5.    The characterization of the settlement set forth in Paragraphs 23-24 is not complete or accurate, and St. Pierre denies the same.

## III.    RELEVANT FACTS

### A.    *Timeline Leading to Bankruptcy*

1.    In 2003, St. Pierre co-founded a start-up company that later became Legacy Global Sports.[2]  Legacy and its affiliated companies provided services to elite youth athletes at

---

[2] Legacy initially was called Selects Sports Management, Inc. ("SSMI").  It was renamed "Legacy Global Sports" as part of a 2016 reorganization which involved the creation of three new entities:  Legacy Global Sports, L.P.  ("Legacy"); Legacy Global Sports, LLC ("Legacy/LLC"), which is Legacy's General Partner; and Legacy Global Sports Holdings, Inc.

youth sporting events throughout Northern America and Europe. From January 2014 through November 2018, St. Pierre was Legacy's CEO and President.

2.      On April 30, 2018, JRC invested $16 Million in Legacy and became by far the Company's largest (35.3%) equity holder.

3.      Any evaluation of the Stipulation must account for the nature and extent of JRC's involvement with, and pervasive control over, Legacy from April 30, 2018 until the involuntary petition was filed in May 2020, with the order for relief being effective on June 23, 2020 (the "Petition Date").

- *September 2017*: St. Pierre hired Steve Griffin as Legacy's Executive Vice President of Strategy and M&A. Griffin introduced JRC, an existing Griffin contact, to Legacy as a potential investment opportunity. Griffin later was instrumental to JRC's execution of self-serving transactions that benefitted JRC but harmed Legacy and its creditors.

- *March 2018*:  several weeks before closing on its investment in Legacy, JRC met with Legacy's existing lender, Provident Bank, seeking Provident's approval for the JRC investment. A JRC partner represented to Provident that the investment proceeds would be used to pay off in full Provident term loans totaling approximately $8 million.

- *April 30, 2018*: JRC closed on its $16 million investment in Legacy for 35.3% of Legacy's equity. At that time, another limited partner, Generation Capital ("GenCap") invested $2.5 million, and St. Pierre invested $500,000.

---

("Legacy/Holdings"), which is Legacy/LLC's sole Member. Legacy/Holdings was (and is) 100% owned by SSMI, and the original owners of SSMI (including St. Pierre) retained their equity stake in that company. Legacy/Holdings owns approximately 37.75% of Legacy's total Limited Partner Units.

- *April 30, 2018*:  JRC presented a Third Amended Limited Partnership Agreement (the "LPA") to other equity owners.  The LPA:

  o Gave JRC expansive control over Legacy and approval rights with respect to material actions to be undertaken by the Company, including distributions, acquisitions, the issuance of securities, the incurrence of debt, the hiring or termination of employees, and capital expenditures.

  o Provided for the creation of a new, seven-member Board controlled by JRC. JRC designated three Board members, while Griffin (who was aligned with JRC), designated one member.  St. Pierre and GenCap designated one member each.  JRC's Board designees were Richard Dresdale, David Wittels, and Michael Somma, each of whom is identified as a Manager on Legacy's Statement of Financial Affairs, filed July 2, 2020 [Dkt. 64].

- Following the closing on its investment, JRC disrupted Legacy's relationship with Provident by refusing to honor its commitment to pay off the Provident term loans.

  o Instead, JRC directed that the $19 million invested on April 30, 2018 be placed into a new Bank of America account.

  o JRC then used its leverage to renegotiate its original agreement with Provident to pay off approximately $8 million in bank loans.  JRC (acting for Legacy) and Provident agreed that Legacy would pay off only $2 million of loans in exchange for more stringent covenants on the remaining loans.

  o Legacy would soon breach the new terms that JRC renegotiated, leading to Provident freezing Legacy's corporate accounts and JRC taking over as Legacy's primary lender.

- *September 2018*:  JRC installed a JRC partner, Derek Irwin, as CFO of Legacy.  Irwin remained a partner of JRC while acting as Legacy's CFO, and he continued to use a JRC email address.

- *November 2018*:  JRC terminated St. Pierre as Legacy's CEO and President, installed Griffin as the new CEO, and eliminated St. Pierre's position on the Board.  JRC terminated St. Pierre after he objected to a JRC plan to lower Legacy's valuation and set the stage for another capital raise through which JRC could acquire additional equity at an artificially lower price, to the detriment of Legacy's minority owners.

- *June 7, 2019*:  After Legacy (while under JRC's control) had breached its covenants with Provident Bank, thus causing Provident to freeze Legacy's accounts and demanded repayment of its loans in full, JRC caused Legacy to issue convertible debenture notes to JRC and GenCap in the amounts of $3.5 million and $2,174,183, respectively (the "Convertible Notes").  See Exhibit A (5/30/19 Term Sheet) and Exhibit B (6/7/19 Second Amended and Restated Note Purchase and Exchange Agreement).  This was done without notice to other limited partners.  JRC alleged the transaction was necessary because Legacy was unable to secure outside financing from a commercial lender.  The terms of the transaction saddled Legacy with unconscionable interest obligations and fees and allowed JRC to dilute the interests of other limited partners.  For example:

  o By characterizing the investment as a loan (rather than equity investment), JRC demanded, and was granted, a first-priority security interest in all Legacy assets.

- o The Convertible Notes matured in one year and accrued interest at a rate of **15% per annum, or nearly 300% more than the 5.5% interest rate on Legacy's prior loans with Provident**.

- o If Legacy initiated an additional round of financing more than 270 days after the closing of the NPA, the amount of the Convertible Notes, including interest, automatically converted to new Units in Legacy, based on a 50% discount of the price for the new Units.

- o Legacy was required to pay JRC a "monitoring fee" of $200,000 per year. Legacy provided no information to justify this fee.

- o Legacy was required to pay all attorneys' fees, travel expenses, and other costs incurred by JRC in connection with the issuance of the Convertible Notes. *Additionally*, Legacy was required to reimburse JRC for up to $75,000 each for attorneys' fees and costs incurred in connection with the April 2018 capital raise.

- o Legacy was required to pay $300,000 in other expenses associated with the capital raise. Legacy refused to produce any information about this fee.

- *June 20, 2019*: Two weeks after the Convertible Notes had been issued, Legacy – through the management of JRC's agents, Steve Griffin (CEO) and Derek Irwin (CFO and JRC Partner) – first disclosed the transaction to certain other holders of Limited Partner Units ("Holders") who, under the LPA, were entitled to exercise preemptive rights and acquire their pro rata portion of the Notes, thereby preventing a dilution of their interest in Legacy. See Exhibit C (6/20/19 Notice of Issuance of

Equity Securities: Preemptive Rights).  To discourage the Holders' participation, JRC refused to disclose information regarding the terms of the investment, which Holders needed to determine whether to exercise their preemptive rights.  As a result of JRC's conduct, no Holders were able to exercise their preemptive rights. [3]

- *November 2019*:  St. Pierre presented JRC with an offer to buy the hockey and tours divisions of Legacy for $10 million and included proof of bank financing.  JRC rejected that offer.

- *December 28, 2019*:  Griffin sent a letter to equity holders (the "12/28/19 Notice"), a copy of which is attached as Exhibit D, which alleged that unless the holders consented to a drastic restructuring/recapitalization transaction that would both grant JRC an additional, fourth seat on the seven-member Board and drastically increase JRC ownership in Legacy, the Company likely would file a Chapter 11 petition for Legacy.[4]  As described, the transaction would entail: JRC "loaning" $2 million to Legacy via a convertible note; the conversion of other holders' existing equity into common limited partnership units; the issuance of a new class of preferred limited partnership units to JRC; and the elimination of preemptive rights from the LPA.    In the Notice, Griffin alleged:

---

[3] In August 2018, St. Pierre moved for a TRO in New Hampshire Superior Court to require Legacy to extend the deadline for other equity holders to exercise preemptive rights, until Legacy complied with its obligation under the LPA to provide holders with information they were entitled to receive concerning the transaction.  The Superior Court concluded that St. Pierre had established a likelihood of prevailing on the merits of his claim that Legacy failed to provide the information required by the LPA.  The Superior Court declined to issue a TRO because it concluded St. Pierre had not shown that the harm caused by Legacy's conduct could not be compensated through an award of monetary damages (to be determined at a later time).

[4] The evidence shows that Legacy's financial difficulties were due to profligate spending by the JRC-controlled Board.  From 2018 to 2019, under JRC management, Legacy's total SG&A (selling, general and administrative) expenses increased $18 million year over year while revenues remained stagnant.

- As a result of both "operating losses," and the existence of alleged legal "claims" held by JRC over alleged accounting "misconduct" by Legacy officers,[5] the Company was "effectively preclude[d] … from raising additional capital from outside financing sources," and was "experiencing severe liquidity challenges that are jeopardizing current operations, as well as the Company's ability to continue as a going concern."

- The recapitalization/restructuring "mitigates the risk that the Company's ongoing liquidity challenges could materially impact operations, threaten the Company's ability to continue as a going concern, or ultimately require the Company to seek a comprehensive restructuring of its balance sheet – whether on an out of court basis or under the auspices of Chapter 11 of the United States Bankruptcy Code."

- The Company had "not identified viable alternative sources of debt or equity that would infuse capital into the Company in the amounts needed, and on the timetable required.  If the Company does not consummate the recapitalization in the very near future, there is substantial risk that the Company will not be able to meet its obligations to vendors and customers in the ordinary course and will need to consider bankruptcy or other debt resolution alternatives."

  (Emphasis added).

- *January 2020*:  Legacy equity holders were forced to capitulate to JRC's proposed recapitalization/restructuring transaction under the threats of Chapter 11 bankruptcy,

---

[5] No accounting "misconduct" occurred.   JRC's allegations related to the accounting method that Legacy had employed at the advice of its outside accounting firm.  JRC changed the accounting method when it assumed control of Legacy – not because the prior method was improper (it was not), but because the different method served JRC's own self-interests.

which be destructive for Legacy's business and clients.  The transactional documents (see Exhibit E), including a Fourth Amended and Restated LPA:

- o  Granted JRC the right to appoint four of the seven Board seats, and allowed Griffin to appoint one of the three remaining seats;

- o  Provided for a 63% ownership by JRC;

- o  Granted JRC the right to receive an annual $200,000 "monitoring" fee;

- o  Required Legacy to pay all attorney's fees and costs incurred by JRC in connection with the transaction;

- o  Required Legacy to reimburse JRC for any attorney's fees and cost incurred by JRC if it brought legal claims against Legacy officers/employees over alleged accounting misconduct.

- *April 2020*:  as a result of the pandemic, scheduled sports programs and travel were cancelled.  Legacy customers had prepaid for these events.  However, when hotels and airlines refunded the customer payments to Legacy, JRC refused to remit the refunds to consumers.

- *April 7, 2020*: St. Pierre presented JRC with an offer to purchase Legacy's hockey assets for $4 million.  The offer included a provision to pay back deposits that Legacy's customers made for travel and hotel arrangements.  JRC rejected St. Pierre's offer, alleging it "grossly" undervalued the assets.  On information and belief, JRC also rejected a separate offer from a Chicago-based company to purchase the Legacy hockey assets for $6-7 million.  JRC rejected the offer and alleged it regarded bankruptcy as a better alternative for JRC.

- *April 21, 2020*:  JRC issued another preemptive rights letter to equity holders stating that Legacy issued another promissory note in the amount of $1,122,448 to JRC, accruing interest at the rate of 15%.  This note was also convertible into equity.  The proceeds were used, in part, to pay another JRC note in the amount of $625,000.

**B.**     ***JRC's Deliberate Actions Caused Significant Damage to Legacy and the Debtors.***

4.      As the foregoing timeline shows, JRC undertook a concerted campaign to take control of Legacy for its own purposes while disregarding its obligations to Legacy.  JRC took control of Legacy's Board and daily management, destroyed Legacy's prior banking relationship and became Legacy's lender, increased its equity stake through dubious convertible notes, diluted other equity holders, and pursued transactions that enriched JRC but harmed Legacy and its creditors.  Finally, when the pandemic resulted in an existential crisis for Legacy, JRC acted in its own self-interest to reject substantial offers to purchase Legacy's assets.  Clearly JRC did not expect Legacy's creditors to petition Legacy into an involuntary bankruptcy.

5.      JRC took actions to better its own position and to secure its control over Legacy. The following chart depicts the ownership shift to JRC from April 2016 through the end of 2019:

|  | % in LGS Holdings (<April 2016) | % in LGS LP in April 2018 | % in LGS LP (per Sept 2019 doc) | % of LGS Common Equity (Dec 28, 2019) * |
|---|---|---|---|---|
| John/Maxick (co-founder 2003) | 16.74% | 8.46% | 6.2% | 3.7% |
| Joe Templin (co-founder 2003) | 10.74% | 4.44% | 2.7% | 1.1% |
| Travis Howe (co-founder 2003) | 8.74% | 3.30% | 2.0% | 0.2% |
| Travis Bezio | 3.38% | 1.27% | 0.8% | 0.2% |
| Mitch Larnard/Hockey Plus | 0.52% | 0.31% | 0.2% | 0.1% |
| Ron Cain/Cain Assets (invested 2010) | 59.87% | 24.79% | 15.1% | 6.0% |
| % OWNERSHIP BY LGS HOLDINGS C | 100.0% | 42.6% | 27.0% | 11.2% |
|  |  |  |  |  |
| Gen Cap (invested April 2016) |  | 21.90% | 18.5% | 25.7% |
| JRC (invested April 2018) |  | 35.26% | 54.4% | 62.3% |
| Steve Griffin (invested April 2018) |  | 0.25% | 0.2% | 0.3% |
|  |  | 100% | 100% | 100% |

6.     In the end, the Trustee auctioned off Legacy's assets and netted approximately $370,000.  JRC had rejected offers for only some of Legacy's assets that would have netted much more than ten (10) times that amount in the months preceding the bankruptcy filing.

7.     JRC used its control of the Legacy Board to (a) further increase its influence and control over Legacy's management and operations, (b) dilute the interests of minority Limited Partners, and (c) cause Legacy to pursue debt transactions that enriched JRC but harmed Legacy and its creditors.

## IV.    ARGUMENT

### A.    Standard of Review

1.     The Trustee seeks approval of the Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.   Rule 9019(a) provides, in relevant part, that "[o]n the motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  "[I]n reviewing a settlement agreement for approval purposes, '[t]he [bankruptcy] judge . . . is not to substitute her judgment for that of the trustee, and the trustee's judgment is to

be accorded some deference." *In re Wolverine, Proctor & Schwartz, LLC*, 436 B.R. 253, 266 (D.

Mass. 2010) (quoting *In re Healthco Intern., Inc.*, 136 F.3d 45, 50 n.5 (1st Cir. 1998))

(alterations in original).  The bankruptcy court is expected to "assess and balance the value of the

claim that is being compromised against the value to the estate of the acceptance of the

compromise proposal."

2.      The court is guided by the following factors, among others: (a) the probability of

success in the litigation being compromised; (b) the difficulties, if any, to be encountered in the

matter of collection; (c) the complexity of the litigation involved, and the expense,

inconvenience and delay attending it; and (d) the paramount interest of the creditors and a proper

deference to their reasonable views in the premise.  *In re Brookes*, 2018 WL 5310657, at *7

(citing *Jeffrey v. Desmond*, 70 F.3d 183 (1st Cir. 1995)).

3.      In this case, the Trustee's judgment does not meet the reasonableness standard.

JRC's actions obviously were undertaken in bad faith and against the best interests of the

Debtors and the Debtors' constituents, including customers, creditors, and equity holders.  While

the necessary litigation would be complex, the Trustee is well-experienced in this type of

litigation.  Finally, the proposed settlement is inapposite to the interests of creditors.  JRC caused

harm to creditors, and JRC should not be permitted to take the remnants of value from the

Estates and receive a full release.  If approved, the Stipulation would be an aberration of justice,

and the Court should not countenance this result.

**B.      The Claims that the Trustee Should Pursue**

4.      The following is a summary of the claims that the Trustee has an obligation to

investigate and pursue on behalf of the Estates for the benefit of Legacy's creditors.  Additional

claims may arise after further investigation and discovery, and St. Pierre reserves his right to supplement this Objection.

### 1.   *JRC Breached its Fiduciary Duties to the Debtors*.

5.     When a company is insolvent, the controller, which in this case is JRC, owes a fiduciary duty to the creditors, and the controller has the duty to prove the inherent fairness of their actions.  *See Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 184-85 (Del. Ch. 2014).  When a corporation is insolvent, its creditors take the place of shareholders as the residual beneficiaries of the corporation.  *N. Am. Catholic Edu. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 100-01 (Del. 2007).

6.     Further, as a lender, JRC owed a fiduciary duty to Legacy.  Generally, lenders have no liability for the debts of its borrowers.  "[U]nder certain circumstances, a lender may actively participate in or exercise control over the business of a borrower to such an extent that a fiduciary relationship arises."  *FAMM Steel,* 571 F.3d at 103.  Like the instrumentality theory discussed below, this theory of liability also depends on the extent of control exercised by the lender.  The present case presents a far more compelling set of circumstances than just a mere lender/borrower relationship.  JRC was not only the lender to Legacy, but JRC had cemented its own partners into the business and directed every move of the Company.

7.     In its capacity as a fiduciary, JRC has an obligation to act in the best interests of Legacy, which obligation JRC clearly breached.  *See In re Bos. Celtics Ltd. P'ship S'holders Litig.*, No. C.A. 16511, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) ("Delaware law requires the general partners of limited partnerships to exercise due care and to act in the best interest of the partnership and the limited partners.").

8.      JRC undertook the course of conduct described above in bad faith and for its own

interests.  *See id*.  JRC controlled the Board and exercised pervasive control over the affairs of

Legacy, including, but not limited to, inserting one of JRC's partners into Legacy as its CFO

within four months of its investment.  In addition, one of the Board members, Griffin, was

inserted by JRC as the CEO of Legacy, had a prior working relationship with partners of JRC,

and was beholden to JRC for continued employment and compensation.

9.      Further, all material business decisions relating to Legacy were made by JRC, and

Legacy had no independence from JRC.  Derek Irwin remained a JRC partner after he was

installed as Legacy's CEO, but he owed a fiduciary duty to Legacy, requiring him to act in good

faith and to advance the interests of Legacy.  Despite this fiduciary duty, in each instance where

JRC had to elect between its self-interest and its fiduciary duty to Legacy, it disregarded its

fiduciary duty to Legacy and pursued a course of action to benefit itself to the detriment of

Legacy and its creditors.

10.     JRC had an opportunity to sell a portion of Legacy's assets for as much as $10

million.  Yet, JRC refused to proceed with the proposed sales because it would not have provided

JRC with a satisfactory return on its investment, disregarding what was best for the creditors and

consumers at all times.  JRC also caused Legacy to default on its obligations to the arms' length

lender, Provident, and substituted its own loan at an interest rate that was 300% higher than the

rate under the Provident loan.

11.     Based upon JRC's pervasive control and dominion over Legacy, JRC owed a

fiduciary duty to Legacy and breached that duty, causing harm to Legacy and its creditors.  As a

fiduciary, JRC had a duty to act in good faith to advance the best interests of Legacy and its

creditors.  *See Quadrant Structural Prods.*, 102 A.3d at 183-84, 189.  Under these circumstances,

JRC could no longer be motivated by its own self-interest but was instead required to act to

advance the best interests of Legacy.  Where JRC's actions advanced its own self-interest to the

detriment of Legacy, those actions gave rise to a breach of its fiduciary duty in the form of a

violation of the requirement to act in good faith, which is a fundamental condition of the duty of

loyalty.  *See id.*

12.     By reason of JRC's use of its dominant and controlling position, it manipulated

Legacy and its consumers' deposits solely for JRC's benefit, thereby rendering Legacy and its

creditors no more than a mere instrumentality of JRC.  Any combination of the foregoing facts is

sufficient to support a finding of a fiduciary relationship.  Taken together, the facts

overwhelmingly establish that JRC stood in a fiduciary relation to Legacy, owed a fiduciary duty

to Legacy and its creditors, and breached that duty.  Here, the Trustee should have done the

research to establish that JRC is an insider of Legacy and exercised domination and pervasive

control over the actions of the Company, thereby demonstrating the fiduciary relationship.

### *2.     Legacy was a Mere Instrumentality of JRC.*

13.     The instrumentality theory of lender liability arises when "a creditor is

responsible for the obligations of its debtor when the creditor treats the debtor as a mere business

conduit for the purposes of the dominant corporation." *Schwan's Sales Enters., Inc. v. Commerce

Bank 6 Trust Co.*, 397 F. Supp. 2d 189, 194 (D. Mass. 2005)). "The instrumentality theory is

akin to the piercing of the corporate veil doctrine, and has generally been used by *third party

creditors* seeking to hold a lender liable for the debts of the borrower." *Id.* (citing *FAMM Steel,

Inc. v. Sovereign Bank*, 571 F.3d 93, 104 (1st Cir. 2009)). To find a lender liable under the

instrumentality theory, "[t]he creditor's control and dominance over the borrower [must be] so

substantial as to indicate that the effective control of the borrower's operations and affairs rests

with the creditor." *Id.* at *6 (citing *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*,

483 F.2d 1098 (5th Cir. 1973)).

14.     Two essential elements for liability under the instrumentality doctrine are: "the

dominant corporation must have controlled the subservient corporation," and "the dominant

corporation must have proximately caused plaintiffs' harm through the misuse of its control."

*F.C. Imports, Inc. v. First Nat'l Bank of Boston, N.A.*, 816 F. Supp. 78, 91 (D.P.R. 1993)

(*abrogated on other grounds)).*

15.     JRC exercised complete domination over Legacy.  JRC completely controlled

Legacy's finances and business operations to suit its own purposes.  JRC's actions directly

resulted in the insolvency of Legacy and the cessation of its business operations.

### *3.     JRC's "Loans" Should be Recharacterized as Equity.*

16.     Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court

may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title."  11 U.S.C. § 105(a).  Recharacterization of debt as equity is among the

equitable powers which a Bankruptcy Court may exercise.

17.     The Sixth Circuit has adopted a set of eleven factors to determine whether a loan

is actually an equity infusion.  *See Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics,*

*Inc.*), 269 F.3d 726, 748 (6th Cir. 2001).  "While there is no controlling precedent in the First

Circuit, courts" have used these eleven factors to "determine if recharacterization is appropriate."

*In re Comprehensive Power, Inc.*, 578 B.R. 14, 26 (Bankr. D. Mass. 2017) (citing *In re*

*Wolverine, Proctor & Schwartz, LLC*, 527 B.R. 809, 832 (D. Mass. 2015)).  The factors are as

follows:

(a)     the names given to the instruments, if any, evidencing the indebtedness;
(b)     the presence or absence of a fixed maturity date and schedule of payments;

(c)     the presence or absence of a fixed interest rate and interest payments;

(d)     the source of repayments;

(e)     the adequacy or inadequacy of capitalization;

(f)     the identity of interest between the creditor and the stockholder;

(g)     the security, if any, for the advances;

(h)     the corporation's ability to obtain financing from outside lending institutions;

(i)     the extent to which the advances were subordinated to the claims of outside creditors;

(j)     the extent to which the advances were used to acquire capital assets; and

(k)     the presence or absence of a sinking fund to provide repayments.

*Id.* (quoting *In re Dornier Aviation (N. Am.), Inc.,* 453 F.3d 225, 233 (4th Cir. 2006)). However, "[n]one of these factors is dispositive and their significance may vary depending upon circumstances." *Id.* (quoting *Dornier*, 453 F.3d at 234). Recharacterization involves treating what is likely labeled as a debt as an equity interest instead. *See In re Equip. Equity Holdings, Inc.*, 491 B.R. 792, 848 (Bankr. N.D. Texas 2013) ("if it looks like a duck and quacks like a duck, it must be a duck").

18.     Here, the JRC Notes have the characteristics of an equity transaction. JRC admitted that Legacy had no other available sources of financing. The JRC Notes were intended to be convertible to equity, if Legacy could not repay the loan. In at least once instance, JRC extended a loan, at least in part, to repay a prior JRC note. Legacy had inadequate capital. Legacy had no independence from JRC, and JRC dominated all of Legacy's business transactions and controlled all decisions that Legacy made, both at a strategic level and in daily operations.

19.     JRC's claim should be characterized as equity on the basis that the relationship between JRC and Legacy reflected equity transactions, not an arm's-length third-party lending relationship, as the loans were negotiated by and between JRC employees who represented both the lender and the borrower. JRC wore multiple hats in these transactions, being the purported

lender, the controlling shareholder of the purported borrower, the CFO, and the controlling

member of the Board of Directors.

20.    JRC clearly dominated all of the business affairs of Legacy.  JRC installed its own

partner as the CFO of Legacy, and it appointed Steve Griffin, who introduced JRC to Legacy, as

the CEO of Legacy.  On information and belief, at least the CFO continued to receive payments

from both JRC and Legacy, and JRC had the right to terminate both the CEO and CFO if they

did not act in accordance with JRC's directives.  JRC controlled Legacy's lending relationship,

its finances, its officers and its budget.

21.    JRC misused its control over Legacy to cause significant harm.  JRC changed

Legacy's banking relationship from the arms' length, 8% interest rate loans from Provident to

the JRC convertible debentures at 15% interest.  JRC also charged significant management and

other dubious fees, increasing Legacy's overhead without a corresponding increase in revenues.

Only JRC benefitted from these actions.  JRC increased the risk of loss to Legacy creditors while

it knew it was insolvent by characterizing its advances to Legacy as secured loans instead of

making the needed equity investment.  At the end, JRC rejected meaningful offers for Legacy's

assets that would have resulted in payments to creditors.

**4.** ***JRC's Claim Should be Equitably Subordinated to the Claims of Unsecured Creditors.***

22.    Section 510(c) of the Bankruptcy Code provides "after notice and a hearing, the

court may (1) under principles of equitable subordination, subordinate for purposes of

distribution all or part of an allowed claim to all or part of another allowed claim or all or part of

an allowed interest to all or part of another allowed interest; or (2) order that any lien securing

such a subordinated claim be transferred to the estate.  Here, JRC's deliberate scheme to pillage

the Debtors for its own benefit, leaving the Estates with assets worth a fraction of their former

value, is cause to equitably subordinate the JRC.

23.    The First Circuit has adopted the three-part test for equitable subordination as

"delineated in a Fifth Circuit opinion, *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir.1977)." *In*

*re Merrimac Paper Co., Inc.*, 420 F.3d 53, 59 (1st Cir. 2005).  In order to demonstrate equitable

subordination, the first requirement is that "the claimant be found to have engaged in inequitable

conduct." *Id.* (citing *Mobile Steel,* 563 F.2d at 700).  Next, "the misconduct must have either

resulted in injury to creditors or given the claimant an unfair advantage." *Id.* (citing

*Mobile Steel,* 563 F.2d at 700).  The third requirement is that "equitable subordination of the

claim must not be in conflict with the provisions of federal bankruptcy law." *Id.* (citing

*Mobile Steel,* 563 F.2d at 700).  Additionally, with respect to the remedy of equitable

subordination, the First Circuit has explained that "[w]hether the creditor is an insider or

fiduciary of the debtor is fundamentally important to the level of scrutiny that courts apply to

allegations of misconduct against a creditor." *In re 604 Columbus Ave. Realty Tr.*, 968 F.2d

1332, 1360 (1st Cir. 1992) (citing *In re Fabricators, Inc.,* 926 F.2d 1458, 1465 (5th Cir.1991))

(noting that evidence of "more egregious misconduct such as fraud, spoliation or overreaching is

[only] necessary" when "the claimant is ***not*** an insider" (internal quotations and citations

omitted) (emphasis added)).

24.    The conduct of JRC clearly meets the elements necessary to establish equitable

subordination.  First, JRC engaged in a concerted campaign to drain the value of the Debtors for

its own benefit. *See In re Mobile Steel Co.*, 563 F.2d at 700-02 ("In determining whether the

conduct is inequitable, courts apply a standard of viewing the conduct through the prism of

whether it is contrary to equity and good conscience.  This standard includes fraudulent conduct,

lack of good faith by a fiduciary, unjust enrichment, undercapitalization, and controlling the use

of the debtor as a vehicle to benefit itself.").

26.     Second, JRC caused substantial injury to the Debtors and their creditors by

bankrupting the Debtors and making them unable to continue in business.  JRC engaged in a

course of conduct from the inception which was lacking in good faith, breaching of its fiduciary

duty, and dominating and controlling Legacy to benefit itself and to the detriment of its creditors.

*See Official Committee of Unsecured Creditors v. Credit Suisse First Boston* (*In re Exide Techs.,*

*Inc.*), 299 B.R. 732, 744 (Bankr. Del. 2003) (determining that pervasive control over the debtor

for its own advantage and to the detriment of other creditors was inequitable and warranted

subordination.).

26.     Third, subordinating the JRC Claim will not conflict with provisions of

bankruptcy law; subordination of the JRC Claim is appropriate to cause a just distribution of the

Debtors' assets to the parties harmed by JRC's conduct.  Indeed, JRC styled its investment as

secured debt as opposed to equity investment and granted itself a first priority security interest in

Legacy's assets.  JRC's purpose in funding the business through loans as opposed to an equity

investment was to impose the risk of Legacy's inevitable failure on Legacy's creditors.

27.     Finally, JRC was an insider of the Debtors and owed a fiduciary duty to the

Debtors and their equity owners.  JRC continued to style its advances to Legacy as secured loans

as opposed to equity, thereby placing itself in a senior position to recoup its investment ahead of

Legacy's creditors.  JRC further continued to recoup its investment by syphoning cash out of

Legacy in direct and indirect manners such as payments to JRC consultants, CPA firms,

attorneys, and for management fees, consulting and other fees, interest, principal, etc., while

Legacy's creditors continued to support Legacy with unsecured credit and continued deposits for

future events.  The effect of this conduct was that instead of JRC making the appropriate equity

contribution to capitalize Legacy and thereby bear the risk of loss due to insolvency, JRC

structured the advances as secured loans, giving it a priority on the Legacy assets in the case of a

liquidation, putting all of the risk of insolvency on the unsecured creditors.  JRC abused its

position for its own benefit through a deliberate scheme, and JRC should not be allowed to

benefit from its misconduct.

28.     In sum, the Trustee should have found through his research detailed factual

allegations to warrant a finding that JRC used its position of dominance and control to confer

upon itself an unfair advantage.  The misconduct included depriving Legacy of the opportunity

to engage in asset sale transactions which would support Legacy as a going concern and the

payment of creditors.  During the purposeful delay in addressing Legacy's future for over a year

while JRC perfected its security interest, and creditors' claims increased.  Accordingly, the

substantial harm caused by JRC's actions supports equitable subordination of its claims.

## 5.      *Pre-petition Amounts Paid to JRC Should be Recovered as Fraudulent Transfers*

29.     Section 548 of the Bankruptcy Code provides that "that a trustee may avoid any

transfer of a debtor's interest in property made within two years before the filing of a bankruptcy

petition if the transfer was actually or constructively fraudulent."  *In re Comprehensive Power,*

*Inc.*, 578 B.R. 14, 30 (Bankr. D. Mass. 2017) (citing 11 U.S.C. § 548(a)(1)).  The statute:

> recognizes as fraudulent those transfers made by a debtor with
> actual intent to hinder, delay or defraud creditors, as well as any
> transfer that is deemed to be constructively fraudulent because it
> was made for less than reasonably equivalent value when a debtor
> is, or is rendered, insolvent, undercapitalized, or unable to pay its
> debts as they become due.

*Id.* (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254 (1st Cir.

1991)).

30.     A trustee "may avoid any transfer . . . of an interest of the debtor in property . . .

made or incurred on or within 2 years before the date of the filing of the petition, if the debtor . . .

made such transfer . . . with ***actual*** intent to hinder, delay or defraud" any

creditor.  11 U.S.C. § 548(a)(1)(A) (emphasis added).  Direct evidence of fraudulent intent is not

always available, and, accordingly, "courts usually rely on circumstantial evidence to infer

fraudulent intent."  *Comprehensive Power*, 578 B.R. at 31.  The First Circuit has identified the

following factors to use in assessing fraudulent intent:

> (a) actual or threatened litigation against the debtor;
>
> (b) a purported transfer of all or substantially all of the debtor's
> property;
>
> (c) insolvency or other unmanageable indebtedness on the part of
> the debtor;
>
> (d) a special relationship between the debtor and the transferee;
> and, *after the transfer*,
>
> (e) retention by the debtor of the property involved in the putative
> transfer.

*Id.* (quoting *Max Sugarman Funeral Home*, 926 F.2d at 1254-55).

31.     Alternatively, in lieu of a claim of fraudulent transfer made with actual intent, a

trustee can assert a "constructively" fraudulent transfer claim.  *Comprehensive Power*, 578 B.R.

at 31.  To demonstrate a constructive fraudulent transfer, a trustee must show that: (a) the debtor

received less than reasonably equivalent value in exchange for the transfer made or obligation

incurred; and (b) the debtor (i) was insolvent at the time the transfer was made or obligation

incurred or became insolvent as a result thereof, (ii) was engaged in or about to engage in a

business or a transaction for which its remaining property constituted an unreasonably small

capital, or (iii) intended to incur, or believed it would incur, debts beyond its ability to pay as

those debts matured. *Id.* at 32 (quoting *In re Tri–Star Techs. Co., Inc.*, 260 B.R. 319, 323

(Bankr. D. Mass. 2001)).

32.     The trustee "must have alleged facts sufficient to allow the court to draw a

reasonable inference that the [d]ebtor did not receive 'reasonably equivalent value' for the

purported transfers." *Id.* (citing 11 U.S.C. § 548(a)(1)(B)).

33.     In the period prior to the Petition Date, JRC caused substantial amounts of money

to be transferred from the Debtors to JRC and/or its consultants and attorneys.  The transfers

included, but are not limited to, exorbitant interest payments, fees for transactions that benefitted

JRC, and unexplained "advisory fees."  The Debtors, once thriving businesses valued at tens of

millions of dollars, were insolvent at the times of such transfers.  JRC should be required to

return the amounts that it took from the Debtors at the expenses of legitimate creditors.

## V.    CONCLUSION

34.     The Stipulation clearly does not serve the best interests of creditors.  The Trustee

should not be authorized to disregard the deliberate efforts that JRC undertook in the two (2)

years prior to the Petition Date in an attempt to enrich itself at the expense of creditors.  Rather,

the Trustee should thoroughly investigate JRC's conduct.


**WHEREFORE**, St. Pierre requests that the Court:

1.  Deny the Trustee's Motion for approval of the Stipulation; and

2.  Grant such other and further relief as the Court deems just and equitable.

JOHN ST. PIERRE

By his counsel,

/s/ *Jennifer V. Doran*
Christopher H.M. Carter (BBO # 561146)
Jennifer V. Doran (BBO # 652518)
Hinckley, Allen & Snyder, LLP
28 State Street
Boston, MA 02109-1775
(617) 378-4128 (Phone)
(617) 345-9020 (Fax)
ccarter@hinckleyallen.com
jdoran@hinckleyallen.com

Dated: August 18, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2021, I caused to be served a true and accurate copy of the foregoing document upon counsel as follows through the Court's CM/ECF System and by First Class Mail to the following:

Amy Amelkovich
c/o Darla Mullner
241 Sussex Lane
North Aurora, IL 60542
Lama Chebaclo
4511 Moorland Ave
Edina, MN 55424

Melanee Chmiel
11494 Balsam Way
Woodbury, MN 55129

Lukas Havlicek
Pod Kaplickou 378
250 72 Predboj

Paula K. Jacobi on behalf of Petitioning Creditor Bay State Hockey, LLC
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606

Paula K. Jacobi on behalf of Petitioning Creditor KMD Hockey, LLC
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606

Paula K. Jacobi on behalf of Petitioning Creditor Lynch Hockey, LLC
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606

Paula K. Jacobi on behalf of Petitioning Creditor Pro Hockey Development (2015), Inc.
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606

Paula K. Jacobi on behalf of Petitioning Creditor Super Series AAA, LLC
Barnes & Thornburg LLP
One North Wacker Drive

Suite 4400
Chicago, IL 60606

Craig Jalbert
Verdolino & Lowey, P.C
124 Washington Street
Foxboro, MA 02035

Jason Murphy
85 Candia Road
Manchester, NH 03109

Paul E. Saperstein Co., Inc.
Auctioneers/Appraisers
c/o Michael Saperstein
148 State Street
Boston, MA 02109

Barry Pollack
Pollack Solomon Duffy, LLP
101 Huntington Avenue
Suite 530
Boston, MA 02199

The Siegfried Group, LLP
Leigh-Ann Raport, Senior Counsel
1201 N. Market Street, Ste 700
Wilmington, DE 19801

The Siegfried Group, LLP
c/o Richard G. Placey
Montgomery, McCracken, Walker & Rhoads
1105 N. Market Street, Suite 1500
Wilmington, DE 19801

The Siegfried Group, LLP
c/o William J. Ulrich
Vice President, Legal & HR
1201 N. Market Street, Suite 700
Wilmington, DE 19801

Scott Wilson
408 Summit Ave.
Westfield, NJ 07090

/s/ *Jennifer V. Doran*_____
Jennifer V. Doran